## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 19-00730-5-JNC |
| CAH ACQUISITION COMPANY #1, LLC, d/b/a WASHINGTON COUNTY HOSPITAL | CHAPTER 11 |
| THOMAS W. WALDREP, JR., as Litigation Trustee, | |
| Plaintiff, | |
| v. | |
| GILBERT LEDESMA, | Adv. Pro. No. 24-00071-5-JNC |
| Defendant. | |

## AMENDED COMPLAINT

Thomas W. Waldrep, Jr., in his capacity as Litigation Trustee in the above-captioned case (the "Trustee"), complains against Defendant Gilbert Ledesma ("Ledesma" or "Defendant") as follows:

### NATURE OF THE ACTION

1.      Defendant conspired with and facilitated the fraud of the perpetrators of two coordinated schemes to generate fraudulent reimbursements for laboratory tests at a number of rural hospitals located in multiple states. The schemes—which generated massive amounts in fraudulent billings—defrauded third-party payors, private insurers, patients, and ultimately hospitals, like the above-captioned Debtor, which were utilized as instrumentalities in those schemes.

2.     The schemes, in essence, were straightforward: managers for the hospitals caused the hospitals to enter into arrangements with third-party laboratory testing companies.  Pursuant to those arrangements, the laboratory testing companies obtained patient samples from physicians throughout the country, including Defendant.  None of the patients had received treatment from the hospitals or had any connection to the hospitals whatsoever.  The parties would then bill those tests to private insurers as if they had been conducted at the hospitals themselves for patients of those hospitals.  Doing so allowed the hospitals to charge private insurers higher, "in-network" reimbursement rates for procedures that were, in reality, out-of-network and should have been reimbursed, if at all, at much lower rates.

3.     As stated, in addition to defrauding private insurers, the schemes also constituted a fraud on the hospitals.  Rather than turning the proceeds of the schemes over to the hospitals, the perpetrators, including Defendant, pocketed much of the ill-gotten gains while exposing the hospitals to massive liability and jeopardizing their relationships with the private insurers on whose reimbursements the hospitals depended to maintain their operations.

4.     Ultimately, the schemes destroyed the hospitals, the Debtor being no exception. When it was uncovered, the private insurers targeted by the schemes began heavily scrutinizing the hospitals' claims, and, in some instances, stopped doing business with the hospitals entirely. The Debtor and its affiliated hospitals were forced to file for bankruptcy, and some have ceased operation.  As a result, rural communities have been deprived of the health care services, and associated jobs, that they desperately need.

5.     The Trustee thus brings this adversary proceeding, which asserts claims for fraudulent transfer and for facilitating fraud to rectify the harm that Defendant caused the Debtor's business.

## JURISDICTION AND VENUE

6.     This Adversary Proceeding arises from and relates to the above-captioned bankruptcy case (the "Bankruptcy Case").

7.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334.

8.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     This is both a core and non-core proceeding pursuant to 28 U.S.C. § 157.

10.    The Trustee consents to this Court determining the cause and entering final judgment thereon.

## THE PARTIES

11.    The Trustee, Thomas W. Waldrep, Jr., is the Litigation Trustee of CAH Acquisition Company #1, LLC, d/b/a Washington County Community Hospital ("CAH 1" or "Washington County Hospital") and its affiliates (collectively, the "Hospitals") in jointly administered cases proceeding before the United States Bankruptcy Court for the Eastern District of North Carolina.

12.    On information and belief, Defendant Gilbert Ledesma is a citizen and domiciliary of Texas.

## FACTUAL BACKGROUND

### I.    Critical Access Hospitals and the Debtor

13.    The Balanced Budget Act of 1997, Pub. Law. 105-33, created a new category of hospitals, known as critical access hospitals ("CAH").  Hospitals qualify for the CAH program by meeting certain regulatory requirements promulgated by the Centers for Medicare & Medicaid Services ("CMS"), including that the hospital: (1) is located in a rural area; (2) provides 24-hour

emergency services seven days a week; (3) has 25 or fewer inpatient beds also used for swing bed services; and (4) has an annual average acute inpatient stay length of 96 hours or less.

14.     Congress created the CAH program to address a string of rural hospital closures and a concern about the ongoing financial viability of rural hospitals.  The program is designed to ensure the continued viability of rural hospitals, which provide life-saving medical treatment and needed jobs to underserved communities.

15.     To further that goal, CAHs are reimbursed by insurance companies at much higher rates than other hospitals—typically 101 percent of reasonable costs—for most inpatient and outpatient services, including certain laboratory testing procedures.

16.     The Debtor and its affiliates, certain of which are also debtors before this Court, owned and operated a number of for-profit, critical access hospitals (collectively, the "Hospitals") that provided acute care, swing bed, emergency medicine, imaging, rehabilitation, laboratory, and related outpatient ancillary services in small rural areas in North Carolina, Kansas, Missouri, and Oklahoma.  Each of the Hospitals is classified as a CAH or was classified as a CAH before it ceased operations.

17.     In addition to their status as CAHs for purposes of federal reimbursements, each of the Hospitals entered into contractual agreements with certain private insurers (the "Private Insurers"), pursuant to which the Hospitals would be designated as "in-network" providers.  In-network providers are reimbursed for qualifying medical services and qualifying patients at higher rates than other, "out-of-network" providers.

**II.     The Verifi Scheme**

18.     At all relevant times, Paul Nusbaum ("Nusbaum") and Steve White ("White") were co-owners of HMC/CAH Consolidated, Inc.  ("HMC/CAH").

4

19.     HMC/CAH owned 100% of the member and shareholder interests in the Debtor and the other Hospitals.

20.     Through HMC/CAH, Nusbaum and White were in a position of superiority over, and exercised control over, the Debtor and the other Hospitals.

21.     At all relevant times, Nusbaum and White were co-owners of Rural Community Hospitals of America ("RCHA"), which in turn was the manager for the Debtor and other Hospitals.

22.     In or around late 2015, RCHA, Nusbaum, and White directed the Debtor and certain affiliated hospitals to enter into the first of two billing schemes—aimed at enriching themselves at the expense of the government, Private Insurers, and, ultimately, the Hospitals themselves (the "Verifi Scheme").  The Verifi Scheme sought to take advantage of the higher reimbursement rates that the Hospitals received from the Private Insurers in light of their status as "in-network" providers.

23.     In furtherance of that scheme, in or around June 2016, RCHA, Nusbaum, and White directed the Debtor to enter into an arrangement with a hospital laboratory management company, LGMG, LLC, d/b/a Verifi Labs ("Verifi"), to dramatically increase the billings that the Hospitals would generate for performing certain laboratory tests, including urine analysis and blood testing to detect the presence of alcohol or illegal drugs.

24.     The Verifi Scheme required the participation of third parties.  Under the Verifi Scheme, marketing companies were retained (the "Marketers") to enter into agreements with physicians throughout the country, including Defendant, to collect patient samples for urine analysis and blood testing (the "Physicians").  In accordance with their agreement, the Physicians, including Defendant, sent patient samples to Verifi for processing.

25.     Virtually all the patients whose samples were sent to Verifi by the Physicians had not received treatment at any of the Hospitals and had never visited any of the Hospitals.  In many instances, these patients did not even reside in a state where any of the Hospitals were located.

26.     After the tests were performed (by Verifi and its staff), claims for reimbursement would be submitted to the Private Insurers under the Hospitals' billing credentials, even though in many cases: (1) the Hospitals had not performed the tests; and (2) the patients whose blood or urine was tested did not receive treatment and had no connection to the Hospitals.

27.     Submitting the tests under the Hospitals' billing credentials allowed the scheme participants to claim reimbursement for "in-network" services at the higher rates afforded CAHs— rates that would not have been available had the tests been submitted under the billing credentials of the laboratories where the tests were actually performed.

28.     The Verifi Scheme caused the Hospitals to immediately and dramatically increase the claims that they submitted to the Private Insurers for reimbursement and associated revenue.

29.     In particular, the Debtor's monthly lab department revenue went from $116,325.00 in July 2016 to more than $580,000 the following month, then more than $1.2 million by January 2017.

30.     In the following months of the Verifi Scheme (February 2017 – July 2017), the Debtor, a rural hospital with only 25 beds, recognized monthly revenue of $853,994.57, $1,256,093.56, $1,311,199.34, $1,185,032.94, $2,120,012.94, and $1,023,015.81 (respectively) for lab work allegedly performed by the hospital.

31.     Unfortunately, while increasing the Hospitals' purported revenue, little to any of this money actually made its way into the Hospitals' coffers.  Rather, the proceeds from the Verifi

Scheme were transferred to the various scheme participants, including Defendant, leaving the Hospitals with nothing but liability to defrauded third parties.

32.     Unfortunately for the schemers, as the volume of the Hospitals' reimbursements skyrocketed, the Hospitals began facing increasing scrutiny from the Private Insurers.

33.     Certain of the Private Insurers began requiring additional documentation and/or additional review before approving claims relating to laboratory testing.  This increased scrutiny impeded the Hospitals' ability to carry out their day-to-day functions, including providing care and obtaining reimbursement for legitimate patients and legitimate medical treatment.

34.     Along these lines, on March 14, 2017, Terry Amstutz, the Chief Executive Officer for the Debtor, wrote Nusbaum and others informing them that Aetna would no longer reimburse the Debtor for its "outreach" labs performed by Verifi Labs.  In particular, Aetna advised that the submitted lab claims were "improper" and "constitute[d] a pattern of abusive billing and [gave] rise to a reasonable suspicion of fraud."

**III.     The Empower Scheme**

35.     In late 2016, RHCA, Nusbaum, and White began a campaign to part with Verifi and join forces with Jorge A. Perez ("Perez") and his company, EmpowerHMS ("Empower"), to utilize the Debtor (and other Hospitals) in a massive fraudulent billing scheme (the "Empower Scheme") (collectively with the Verifi Scheme, the "Billing Schemes").

36.     On or about March 29, 2017, Nusbaum and White executed a so-called Conversion Agreement, whereby the Hospitals' former corporate parent "sold" 80% of its ownership interests in the Hospitals to Health Acquisition Company LLC ("HAC"), a special purpose entity formed by Nusbaum and White for their ownership in HMC/CAH, in exchange for a release of outstanding debt owed to HAC under a prior loan agreement.

37.    At the same time, Nusbaum, White, and HAC brought in Perez, Empower, and the Perez Group to implement the Empower Scheme.  Immediately thereafter, on April 20, 2017, Nusbaum and White sold Perez (along with Ricardo Perez and Carlos Perez) 50% of HAC.

38.    The Empower Scheme, amazingly, was even worse for the Hospitals.  At least under the Verifi Scheme, some revenue was running through the Debtor and its affiliated hospitals—though the vast majority was immediately transferred to Verifi and other scheme participants.

39.    Under the Empower Scheme, however, Empower H.I.S. (an Empower affiliate), was granted complete control over the operations of each of the Hospitals, including control over their bank accounts, billing systems, and their rights to submit claims to insurance companies with which the Hospitals had "in-network" contracts.  Along these lines, on April 20, 2017, RCHA, Nusbaum, and White bestowed Perez with the title of Primary Manger of HAC, and on August 3, 2017, as reflected in corporate minutes signed by Nusbaum, RHCA, Nusbaum, and White agreed that Perez would "be authorized to act on behalf of HAC and any/all of the individual hospital entities . . . on all matters relating to bank accounts and lending matters including relationships with all banks and government entities."

40.    Likewise, as part of the Empower Scheme, RHCA, Nusbaum, and White authorized Empower H.I.S. to install software at both the CAH Hospitals and the third-party laboratories participating in the Empower Scheme.  The software enabled their laboratories to transmit patient billing information and associated data by wire to Empower in Miami, Florida for the purpose of submitting insurance claims to insurers and other third-party payors.

41.    In doing so, Empower was able to pick and choose which Debtor to utilize for purposes of submitting its fraudulent laboratory billings.  As it relates to Washington County Hospital, lab director, Kari Hardison, began noting a curious daily occurrence.  Every night, she

would create a log of all the lab work performed by Washington County Hospital that day, creating hard copies of the related records. When she would arrive at work the following day, however, numerous additional labs would appear in Washington County Hospital's electronic billing system – notwithstanding that Washington County Hospital's labs had been closed and hospital staff had not run any additional lab work overnight.

42.    As an additional issue, rather than revenue initially running to the Hospitals that had any involvement in related lab work (even if just for billing), the money was placed into a central slush fund maintained by Empower. Upon information and belief, Perez would then cause Empower to make distributions from that account to himself and its other owners as well as other entities and individuals involved in the Empower Scheme. By doing so, the majority of the revenue never even passed through the Debtor and its affiliated hospitals' financial records, only receiving what Perez and Empower chose to share.

43.    Like the Verifi Scheme, under the Empower Scheme, Physicians, including Defendant, agreed to send, and did in fact send, patient samples for urine analysis and blood testing to Empower for processing.

44.    Like the Verifi Scheme, under the Empower Scheme, virtually all the patients whose samples were sent to Empower by the Physicians had not received treatment at any of the Hospitals and had never visited any of the Hospitals. In many instances, these patients did not even reside in a state where any of the Hospitals were located.

### IV.    The Billing Schemes Unravel

45.    In August 2017, the Office of the Missouri State Auditor issued an audit report regarding one of the Hospitals involved in the Empower Scheme, Putnam County Hospital, in Unionville, Missouri (not one of the CAH Hospitals).[1]

46.    The State Auditor found that Putnam County Hospital had seen a "significant increase of questionable revenues from laboratory billings of health insurance companies" arising from "out-of-state patients for lab work not conducted in Putnam County."

47.    The State Auditor noted that hospital officials "have not provided sufficient support to justify why such activity is being billed through the hospital."  The State Auditor further noted that at least one private insurance company was no longer paying any claims for the hospital as a result of the Empower Scheme, and that "[c]ontinued use of such questionable laboratory billings could leave the hospital at risk if such activity is deemed to be inappropriate by the insurance companies billed . . .."

48.    The State Auditor determined that the billings generated by Putnam County Hospital alone exceeded $90 million between December 2016 and May 2017, as compared to $12.7 million for all of fiscal year 2015, and $7.5 million for all of fiscal year 2016.

49.    The State Auditor noted that, while billings had exploded, little of that money was actually going to Putnam County Hospital.  Instead, 80 percent of the new revenues were disbursed to the laboratory companies (including those owned and operated by Perez), with an additional 6 percent going to the billing company and another portion going to out-of-state phlebotomists.

50.    Following the State Auditor's report, the Private Insurers filed lawsuits seeking to recover the amounts they paid the Debtor and the Hospitals for the fraudulent claims.

---

[1] A copy of the State Auditor's report can be found online at
https://auditor.mo.gov/Repository/Press/2017074829206.pdf (last accessed September 10, 2025).

51.     Some of the Private Insurers also terminated their relationships with the Hospitals, thereby depriving the Hospitals of a needed source of revenue.

52.     The discovery of the Empower Scheme also drew the attention of the federal government.  On June 17, 2020, the United States Department of Justice indicted a number of participants in the Empower Scheme, including Perez, for crimes arising from actions related to the Empower Scheme, in a case captioned United States v. Jorge Perez, et al., 3:20-cr-86 (M.D. Fla.), relating to a similar scheme at a Florida hospital.  On June 27, 2022, a federal jury in the Middle District of Florida convicted Perez and his brother Ricardo Perez of conspiracy to commit health care fraud and wire fraud, five counts of health care fraud, and conspiracy to commit money laundering.

## V.    The Hospitals' Bankruptcies

53.     Ultimately, the Hospitals' participation in the Billing Schemes doomed the Debtor and its affiliated hospitals' businesses.  On February 19, 2019 (the "Petition Date"), Washington County, North Carolina, Medline Industries, Inc., and Dr. Robert Venable (collectively, the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against one of the CAH Hospitals, CAH Acquisition Company #1, LLC ("CAH 1", Case No. 19-00730).

54.     On March 15, 2019, the Debtor's bankruptcy case was converted from Chapter 7 to Chapter 11, and the Litigation Trustee was appointed as the Chapter 11 Trustee for the Debtor pursuant to Section 1104 of the Bankruptcy Code.

55.     In March and April 2019, six of the Debtor's affiliates, CAH Acquisition Company 2, LLC ("CAH 2", Case No. 19-01230), CAH Acquisition Company 3, LLC ("CAH 3", Case No. 19-01180), CAH Acquisition Company 6, LLC ("CAH 6", Case No. 19-01300), CAH Acquisition

11

Company 7, LLC ("CAH 7", Case No. 19-01298), CAH Acquisition Company 12, LLC ("CAH 12", Case No. 19-01697), and CAH Acquisition Company 16, LLC ("CAH 16", Case No. 19-01227), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Cases").

56.     On October 19, 2020, the Court entered an Order of Conversion in which CAH 6 was converted from a case under Chapter 11 to a Chapter 7 case.

57.     On that same date, the Court confirmed the Debtor Amended Chapter 11 Plan of Orderly Liquidation (the "Washington Plan").  The Effective Date (as defined in the Washington Plan) occurred on November 3, 2020.

58.     On December 7, 2020, the Court confirmed Chapter 11 plans for each of CAH 2, CAH 3, CAH 7, CAH 12, and CAH 16.  The Effective Dates for each such plan (as defined in the respective plans) were: (i) December 22, 2020 for CAH 7 and CAH 12; and (ii) February 20, 2021 for CAH 2, CAH 3, and CAH 16.  The Effective Date of each such plan converted those Chapter 11 estates into litigation trusts (each a "Litigation Trust", and altogether, the "Litigation Trusts").

59.     The Trustee is the Litigation Trustee under each of the above-mentioned plans, and is vested with the authority to pursue all claims on behalf of the Hospitals' bankruptcy estates.

60.     On April 25, 2024, the Court entered an order extending the time for the Trustee to pursue claims against physicians on behalf of the Debtor to and including July 31, 2024.

**VI.     Initial Discovery of Defendant's Participation in the Billing Schemes**

61.     On August 6, 2021, the Trustee commenced adversary proceedings against Nusbaum, White, Perez, RCHA, and HAC as Litigation Trustee for the Hospitals for claims arising from the Billing Schemes (Adv. Pro. No. 21-00078-5-JNC) (the "N/W Adversary Proceedings").

12

62.     Perez failed to appear, answer, or otherwise respond in the N/W Adversary Proceedings.  Entries of default were entered against him.

63.     The trial of the N/W Adversary Proceedings against the remaining defendants is anticipated to begin later this year.

64.     On June 30, 2023, the Trustee, as Litigation Trustee in the N/W Adversary Proceedings, issued a subpoena to Waystar Technologies, Inc. f/k/a Zirmed Inc. ("Waystar") for claims data submitted under the Hospitals' credentials.

65.     On October 30, 2023, the Trustee, as Litigation Trustee in the N/W Adversary Proceedings, issued a similar subpoena to Experian Health, Inc. ("Experian").

66.     Review of the claims data produced by Waystar and Experian identified Defendant as a participating Physician in the Billing Schemes.

67.     This claims data also includes information regarding the location (zip codes) of the individuals whom Defendant identified as patients in claims Defendant submitted for payment for laboratory services.  Attached as ***Exhibit A*** to this Complaint, incorporated herein by reference, is a map showing the locations of the patients, as identified by Defendant in the claims submitted.

68.     On or about April 4, 2024, the Trustee sent a demand letter to Defendant (the "Demand Letter") outlining the Billing Schemes and the basis for the Trustee's belief and information regarding Defendant's involvement in the schemes.  A copy of the Demand Letter is attached as ***Exhibit B*** to this Complaint and is incorporated herein by reference.

69.     Defendant failed to respond to the Demand Letter.

70.     Between May 1, 2017, and July 28, 2017, Defendant submitted at least 1,212 claims for laboratory tests allegedly performed (or to be performed) by Washington County Hospital,

totaling at least $247,038.00 in claims made, and resulting in at least $68,513.00 in payments to Washington County Hospital.

71.     These claims arose from 153 alleged separate encounters between Defendant and patients during that period.

### VII.    The Ledesma Adversary Proceeding

72.     Based on the Trustee's discovery as detailed above, on July 23, 2024, the Trustee filed his original Complaint against Defendant.  (Dkt. 1) (the "Original Complaint").

73.     As of the date of this filing, Defendant has failed to respond to the Original Complaint.

74.     On October 29, 2024, the Trustee filed a Motion for Entry of Default against Defendant.  (Dkt. 6).

75.     On June 25, 2025, the Court entered an Entry of Default against Defendant.  (Dkt. 13).

76.     On August 5, 2025, the Trustee filed a Motion to Set Aside the Entry of Default entered against Defendant (the "Motion to Set Aside").  (Dkt. 15).

77.     On August 28, 2025, the Court entered an Order granting the Motion to Set Aside. (Dkt. 16).

### VIII.   The Feferman Deposition

78.     On February 21, 2025, the Trustee took the deposition of Dr. Robert Feferman ("Feferman").[2]  A copy of the transcript of the February 21, 2025, deposition of Feferman (the "Deposition") is attached as ***Exhibit C*** to this Complaint and is incorporated herein by reference.

---

[2] Feferman was a defendant in a then-active adversary proceeding before this court (24-00076-5-JNC).  On February 27, 2025, the Trustee filed a Notice of Voluntary Dismissal with Prejudice.  (Dkt. 17 in 24-00076-5-JNC).

79.    Feferman is, and was at all relevant times, a physician practicing in the State of Texas.  *See **Exhibit C*** at 11:20-25.

80.    In early 2017, McKinney took Feferman to dinner to pitch Feferman on participating in the Verifi Scheme (the "Dinner").  *See **Exhibit C*** at 16:3-21.

81.    At the Dinner, McKinney promised Feferman that if he participated in the Verifi Scheme, (1) Feferman would "get some money back" and (2) none of Feferman's patients would have to pay their responsibility of bills for labs that Feferman ordered related to the Verifi Scheme.  *See **Exhibit C*** at 16:11-17:7; 32:18-33:18; 34:7-19; 41:22-42:4[3][4][5]

82.    On March 14, 2017, Feferman sent Verifi a check in the amount of $3,750.00 as an "investment" in Verifi.  *See **Exhibit C*** at 6:24-7:8.

83.    Feferman actively participated in the Verifi Scheme from May 2, 2017 to July 10, 2017.  *See **Exhibit C*** at 45:25-46:3.

---

[3] "Q. Was it your understanding when you signed up with Verifi that patients would not have to pay copays at all?  A. No, it didn't have to do [with] copays for labs.  It had to do with the lab-- if their insurance wouldn't pay what their -- what their insurance wasn't going to cover of that price, they would not be held accountable for it.  That was the thing that they promised me which is exactly what happened.  Q. So not copays at the visit.  Just patient responsibility after -- A. For the labs, yes.  Q. So you were told by Verifi or representatives of Verifi that patients would not have to pay that patient responsibility at all?  A. Yes. We went over this-- I went over this ad nauseam with them because I was convinced something was awry there, and they assured me many times nobody would go to collections because that was my big fear, and I was adamant about that, and they were adamant that would not happen.  Q. When you say 'fear,' you are referring to your patients being sent to collections; is that correct?  A. Yes."  ***Exhibit C*** at 32:18-33:18.

[4] "Q. If we can go back to the selling points of Verifi at that dinner and afterwards, it sounds like there were two things.  There was the money that you would get back.  I believed you referred to it as the cut of the payment that would be made to Verifi, and the fact that your patients would not be sent to collections, would not have to pay their responsibility after the insurance payment.  Is that correct, those two things?  A. That is correct.  They advertised it as if it would be the same as if the patient went to LabCorp or Quest, except I would get some reimbursement back."  ***Exhibit C*** at 34:7-19.

[5] "Q. Now, with Verifi, how does it work?  A. Well, Verifi tries to get in and have the doctor use Verifi instead of one of the labs so that they promise to give the doctor some money back by billing these heavy prices because they, I guess, assume insurance will pay a lot for that.  I guess for a while some insurance paid the outrageous prices."  ***Exhibit C*** at 41:22-42:4.

84.     During that time, Feferman sent lab orders to Verifi that were billed, in part, through Washington County Hospital.  *See **Exhibit C*** at 21:19-22:2.

85.     After the entry of his participation in the Verifi Scheme, Feferman learned that Verifi was billing his patients inflated charges for routine labs-and threatening to cause collection agencies to collect unpaid inflated bills.  *See **Exhibit C*** at 31:14-22; 39:8-40:23.

86.     At the Deposition, when asked if he had any reason to know why the bills that his patients were receiving were so inflated, Feferman responded: "[S]o they could make money I realize."  When asked who he meant by "they", Feferman responded: "Them [Verifi] and me.  I guess I'm one of them." *See **Exhibit C*** at 38:23-39:7.

87.     On July 7, 2017, Feferman received a check in the amount of $600.00 from Verifi described by Feferman as "payback money". *See **Exhibit C*** at 6:24-7:14; 54:25-55:4.[6]  Feferman further described the $600.00 check as Verifi "paying me for some of the labs that they're overbilling." *See **Exhibit C*** at 7:15-24.

### IX.     Discovery of the Extent of Defendant's Participation in the Verifi Scheme Following the Feferman Deposition

88.     Following the Deposition, on February 26, 2025, Feferman provided counsel for the Trustee documentation relating to the Deposition.  That documentation included copies of (1) a March 14, 2017 check paid by Feferman to Verifi in the amount of $3,750.00; (2) a July 7, 2017 check paid by Verifi to Feferman in the amount of $600.00; (3) an undated letter from Verifi regarding its collections process; (4) a March 30, 2018 notice of Verifi's dissolution sent to Feferman by Guest; (5) an undated and unsigned letter from Verifi greeting the addressee as a "shareholder"; (6) a lab requisition form with the Debtor's header; and (7) a October 18, 2017

---

[6] "Q. I just have a few more questions.  That check that you received, that $600 check, it is your understanding that was part of the cut you were promised?  A. Yes." ***Exhibit C*** at 54:25-55:4.

Redemption Agreement between Verifi and Feferman. Copies of the aforementioned documentation are attached hereto, and incorporated by reference herein, as ***Exhibits D, E, F, G, H, I and J***, respectively.

89.    Shortly thereafter, the Trustee discovered, independently of Feferman, the (1) Second Amended and Restated Limited Liability Company Operating Agreement of LGMG, LLC, dated January 30, 2017 (the "Operating Agreement"); and (2) Membership Interest Purchase Agreement between Mobile Science Technologies, Inc., Meridian Waste Solutions, Inc., McKinney, Guest, Gardner and Loudermilk, dated November 1, 2017 (the "Membership Interest Purchase Agreement"). A copy of the Operating Agreement and excerpt[7] of the Membership Interest Purchase Agreement are attached hereto, and incorporated by reference herein, as ***Exhibits K and L***, respectively.

90.    Under Exhibit A to the Operating Agreement, Names of Members; Units; Sharing Ratios and Capital Contributions, "WelNess Benefits, LLC is listed as holding 60% of Verifi's shares and "Investor(s)" is listed as holding 40% of Verifi's shares. *See **Exhibit K***, p. 26.

91.    Schedule 4.1 to the Membership Interest Purchase Agreement, List of Members, Managers, and Officers of Companies, lists the members of Verifi ("Schedule 4.1"). *See **Exhibit L***.

92.    Line 20 of Schedule 4.1 lists Feferman as a "Member" holding six (6) units for a .44% percentage ownership of Verifi in exchange for his $3,750.00 capital contribution. *See **Exhibit L***.

---

[7] The Membership Interest Purchase Agreement is over 300 pages in length. The excerpt relevant to the Trustee's claims is attached.

93.    Line 32 of Schedule 4.1 lists Defendant Gilbert Ledesma as a "Member" holding twelve (12) units for a .89% percentage ownership of Verifi in exchange for a $7,500.00 capital contribution.  *See **Exhibit L***.

## X.    Defendant's Participation in the Verifi Scheme Revealed Following the Deposition

94.    At all relevant time periods, Defendant was a member/investor of Verifi holding twelve (12) units for a .89% percentage ownership.

95.    Defendant became a member of Verifi in exchange for a $7,500.00 capital contribution paid by Defendant to Verifi.

96.    Defendant participated in the Verifi Scheme, at least in part, due to representations by Verifi that (1) Defendant would receive profits of the Verifi Scheme from Verifi in exchange for his participation and (2) Defendant's patients would not have to pay their responsibility of bills for labs that Defendant ordered related to the Verifi Scheme.

97.    Notwithstanding Verifi's representations of the fraudulent nature of Verifi Scheme as alleged in Paragraph 96 of this Amended Complaint, Defendant invested in Verifi and participated in, and facilitated the Verifi Scheme.

98.    Defendant did in fact receive profits of the Verifi Scheme from Verifi in exchange for his participation in the Verifi Scheme.

99.    By nature of his investment in Verifi and active participation in the Verifi Scheme by submitting claims for laboratory tests allegedly performed (or to be performed) by Washington County Hospital as alleged in Paragraphs 70 and 71 of this Amended Complaint, Defendant was a co-conspirator of Verifi, McKinney, Guest, Gardner, Loudermilk, Nusbaum, White, RCHA, Perez and/or HAC and facilitated the fraudulent Verifi Scheme.

## COUNT I
## FACILITATING FRAUD

100.     The Trustee realleges and incorporates paragraphs 1 through 99 as though set forth fully herein.

101.     Defendant agreed with Verifi, McKinney, Guest, Gardner, Loudermilk, Empower, Perez, Nusbaum, White, RCHA, and/or HAC to defraud the Private Insurers at the expense of the Debtor by submitting claims and/or tests to Verifi and/or Empower to be fraudulently billed through the Debtor.

102.     Verifi, McKinney, Guest, Gardner, Loudermilk, Nusbaum, White, Empower, Perez, RCHA, and/or HAC committed overt tortious acts, including, but not limited to, breach of fiduciary duty, conversion, unfair and deceptive trade practices, fraud, and constructive fraud, by using the claims/tests submitted by Defendant to fraudulently bill Private Insurers through, and at the expense of, the Debtor.

103.     These overt tortious acts caused the Debtor significant damages, both in the form of payments made to participants in the Billing Schemes, including Defendant, as well as loss of future profits resulting from insurers refusing payments on other work performed by the Debtor.

104.     Further, the lost income from insurers resulting from the overt tortious acts led to the Debtor's liquidity crisis, precluding its ability to continue operating and forcing its bankruptcy.

Wherefore, the Trustee requests entry of a final judgment for the benefit of the Litigation Trust against Defendant for facilitating fraud and awarding the Litigation Trust damages of no less than $68,513.00, and granting such further relief as is just and appropriate.

## COUNT II
## CONSTRUCTIVE FRAUDULENT TRANSFER

105.    The Trustee realleges and incorporates paragraphs 1 through 104 as set forth fully herein.

106.    Defendant improperly received funds on account of the Billing Schemes from Debtor including, but not limited to, the funds as alleged in Paragraph 98 of this Amended Complaint (the "Transfers").

107.    The Transfers were made without fair consideration.

108.    The Transfers were made for less than reasonably equivalent value.

109.    The Transfers were made while the Debtor had unreasonably small capital.

110.    The Transfers were made while the Debtor intended to incur or believed they would incur debts beyond their ability to pay such debts as they matured.

111.    The Transfers were made in connection with the Billing Schemes and outside the course of ordinary business.

112.    The Transfers are avoidable under N.C. Gen Stat. § 39-23.5 and 11 U.S.C. §§ 544 and 548.

113.    The Trustee may recover the Transfers pursuant to 11 U.S.C. § 550.

Wherefore, the Trustee requests entry of a final judgment avoiding the Transfers and a judgment for the benefit of the Litigation Trust against Defendant for the improper payments arising out of the Billing Schemes, awarding attorneys' fees and costs, and granting such further relief as is just and appropriate.

## COUNT III
## ACTUAL FRAUDULENT TRANSFER

114.    The Trustee realleges and incorporates paragraphs 1 through 113 as set forth fully herein.

115.    Defendant improperly received funds on account of the Billing Schemes from Debtor including, but not limited to, the funds as alleged in Paragraph 98 of this Amended Complaint (the "Transfers").

116.    The Transfers rendered the Debtor insolvent.

117.    The Transfers were made without fair consideration.

118.    The Transfers were made for less than reasonably equivalent value.

119.    The Transfers were made while the Debtor was unreasonably small capital.

120.    The Transfers were made while the Debtor intended to incur or believed they would incur debts beyond their ability to pay such debts as they matured.

121.    The Transfers were made in connection with the Billing Schemes and outside the course of ordinary business.

122.    The Transfers were made for purposes of hindering and/or defrauding the Debtor's creditors.

123.    The Transfers are avoidable pursuant to N.C. Gen. Stat. § 39-23.4 and 11 U.S.C. §§ 544 and 548.

124.    The Trustee may recover the Transfers pursuant to 11 U.S.C. § 550.

Wherefore, the Trustee requests entry of a final judgment avoiding the Transfers and a judgment for the benefit of the Litigation Trust against Defendant for the improper payments arising out of the Billing Schemes, awarding attorneys' fees and costs, and granting such further relief as is just and appropriate.

Respectfully submitted, this the 10th day of September, 2025.

**WALDREP WALL BABCOCK**
**& BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC Bar No. 11135)
Kelly A. Cameron (NC Bar No. 55664)
Chris W. Haaf (NC Bar No. 46077)
James C. Lanik (NC Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
370 Knollwood Street, Suite 600
Winston-Salem, North Carolina 27103
Telephone:  336.722.6300
Facsimile:  336.722.1993
Email: notice@waldrepwall.com


**MCDONALD HOPKINS LLC**
Micah E. Marcus (*specially appearing LR 83.1(e)*)
300 North LaSalle Street, Suite 1400
Chicago, IL 60654
Telephone: (312) 280-0111
Facsimile: (312) 280-8232
Email: mmarcus@mcdonaldhopkins.com

*Attorneys for Trustee*